**Edgar L. REICHHOLDT and Neva M. Reichholdt, Respondents,**

v.

**UNION ELECTRIC COMPANY, a Corporation, Appellant.**

No. 47000.

Supreme Court of Missouri,

Division No. 1.

Nov. 9, 1959.

Motion for Rehearing or to Transfer to Court en Banc Denied Dec. 14, 1959.

William H. Ferrell, Keefe, Schlafly, Griesedieck & Ferrell, St. Louis, for appellant.

N. Murry Edwards, Ninian M. Edwards, St. Louis, for respondents.

HOLMAN, Commissioner.

Plaintiffs were the owners of a new residence which they had constructed upon a tract of land on Weideman Road in St. Louis County, Missouri. On May 5, 1954, that residence (and the contents) was destroyed by fire.. This action was thereafter instituted by plaintiffs against Union Electric Company, Federal Pacific Electric Company, Butler Electric Company, a corporation, and Ralph Butler, doing business as Butler Electric Company, to recover damages for the loss of their home and personal property as a result of the fire. The action was dismissed as to defendants Federal Pacific and Butler Electric Company, a corporation, prior to trial, and at the close of plaintiffs' evidence the court directed a verdict for defendant Ralph Butler. The jury returned a verdict for $35,000 against the remaining defendant, Union Electric Company. Union Electric (hereinafter referred to as the defendant) has

appealed from the ensuing judgment and here makes the sole contention that the evidence was legally insufficient to support the judgment and hence that the trial court erred in overruling its motion for a directed verdict and its subsequent motion to set aside the verdict and enter judgment for said defendant.

Plaintiffs' home had been constructed on a tract of land located near the home of their daughter and son-in-law, Mr. and Mrs. Fred Stock. The house had been substantially completed at the time of the fire but had not yet been occupied by plaintiffs as their home. However, for several weeks prior to the fire they had been in the process of moving their furniture and personal effects into the house and most all of their belongings of that nature were in the house when it was destroyed. As will hereinafter more fully appear, the evidence indicates that the fire started from a short circuit in the electric wires at a point where the wires passed through the west garage wall of plaintiffs' house.

Plaintiffs had contracted with Ralph Butler for the installation of the electrical wiring in the house. After the work had been completed and inspected by a St. Louis County electrical inspector, the defendant began furnishing service about February 2, 1954.

Defendant maintained a 4,160-volt distribution line along Weideman Road. In order to furnish service to the plaintiffs and to the Stock home it had installed a transformer on a nearby pole which lowered the voltage for customer use from 4,160 volts to 120 and 240 volts. The transformer contained two 10-ampere fuses on the high voltage side. In preparation for receiving service plaintiffs had installed a service pole near the west wall of their (attached) garage. In furnishing service to plaintiffs, defendant ran service lines from the transformer to the top of the service pole where defendant's lines were connected with the wires Mr. Butler had installed for plaintiffs. From the point of said connection plaintiffs' wires ran down the pole, encased in a metal conduit, to a meter base which had been attached to the redwood siding which constituted the exterior garage wall. From the meter base the wires ran through the garage wall and connected with a circuit breaker installed on a section of wood paneling which had been affixed to the inside studding of the garage wall. The distance from the meter base to the circuit breaker was approximately five inches. Between those two points the wires were encased in a 1½-inch thin-walled metal conduit. It was within this five-inch length of conduit that the evidence indicates the short circuit occurred which caused plaintiffs' house to be destroyed.

After the fire it was found that two of the wires leading from the transformer were burned off flush "with the transformer secondary bushing." According to the answers of defendant to certain interrogatories, that fact indicated that a high current was being drawn from the transformer. The transformer fuses had not blown. The damage to the transformer was such that it was replaced and thereafter "scrapped."

Plaintiffs presented Mr. Donald Ross, an electrical engineer, as an expert witness. A hypothetical question containing various factual assumptions was propounded to Mr. Ross and various opinions based upon those assumptions were expressed by the witness. He expressed the opinion that the instant short circuit had occurred in the wires which ran from the meter base to the circuit breaker, which wires were encased in a metal conduit; that in order to have a short circuit there must be a break or defect in the insulation surrounding the wires and either two of the wires must touch each other, or one wire must touch the metal conduit; that the defect in the insulation might have occurred in the manufacturing process, or might have been caused when the wires were pulled into the conduit; that the short circuit caused approximately 590 amperes of current to flow for about ten seconds at the place of the

short which created 330 BTU's of heat resulting in a temperature at that point of more than 2,900 degrees Fahrenheit; that the temperature was more than enough to melt the metal conduit; that wood will ignite at 1,100 degrees Fahrenheit; that the instant temperature was sufficient to ignite any of the wood in plaintiffs' garage wall which might have been touching the conduit.

Mr. Ross explained that the function of a circuit breaker is to terminate the flow of electricity in the event of a short circuit or other fault on the load side, that is, the side to which the current is flowing; that the circuit breaker installed on the inside wall of plaintiffs' garage would afford protection in the event of a short circuit in any part of plaintiffs' home beyond the circuit breaker, but did not protect from the instant short circuit because it was on the opposite side of the circuit breaker.

On cross-examination the witness stated that the St. Louis County Electrical Code would not have prohibited plaintiff from placing a circuit breaker on the outside garage wall near the meter base, and if plaintiffs had done so their property would have been adequately protected against the instant short circuit; that no provision of the code required any particular standard of fusing by the distributor in order to protect the customers' lines. The witness further stated that the only device on the defendant's lines which could have terminated the flow of electricity in the event of a short circuit on plaintiffs' lines was the fuses on the transformer. However, he calculated that the 10-ampere fuses on the transformer should have withstood the 590-ampere current created by the short circuit for 200 seconds before they would have blown. As a matter of fact, however, he pointed out that the current ceased in about ten seconds because certain leads were burned off of the transformer. He expressed the opinion that 5-ampere fuses should have been used on the transformer; that 5-ampere fuses would have supplied the load into the

Stock and Reichholdt houses and still would have afforded protection from short circuits which was not present when the larger 10-ampere fuses were used; that if 5-ampere fuses had been used the current, upon the occurrence of the instant short circuit, would have been stopped in .55 seconds, in which time there would not have been sufficient heat created to have ignited the wood in the garage wall; that because the fuses used were too large, the circuit serving the homes of the Stocks and plaintiffs was not reasonably safe.

Mr. Ross testified further that the minimum standards of the National Electrical Manufacturers Association require that a transformer such as the one here involved be constructed with a short circuit capacity that will carry a current of 590 amperes for $3\frac{1}{2}$ seconds. He also stated that there were no transformer fuses between the 10-ampere size defendant was using and the 5-ampere capacity which the witness thought should have been used. Upon cross-examination Mr. Ross stated that in fusing a transformer, continuity of service to all customers on the circuit should be considered since a fuse of lower capacity will blow sooner than one of higher capacity, thereby terminating service to all customers served by the transformer; that it should be fused so that in event of a short circuit in a customer's home the fuse of the customer would blow first, and that consideration should also be given to the fact that certain utility switching operations sometimes require a transformer to withstand from 20 to 50 times its rated capacity for short periods of time.

The instant fire was discovered by Mr. Stock at 2:50 a. m. on the date heretofore mentioned. At that time, according to Mr. Stock, the fire was burning in the west wall of the garage. For the purposes of this opinion we will assume that the fire started from the short circuit in the conduit heretofore described, although we should perhaps mention that defendant contends that the short resulted from damage

caused by a fire that was already in progress.

No difficulty in electrical service had been experienced by the Stocks or plaintiffs prior to the fire. The service was described as "perfect." It should also be made clear that there is no contention that the great excess of current which was drawn from the defendant's transformer on the occasion in question was caused by any defect in defendant's wires or equipment. It is conceded by plaintiffs that such resulted from the short circuit in their wires. There was no evidence to indicate that defendant's employees had ever inspected or tested plaintiffs' wires or other electrical facilities or that they had any knowledge of any defect therein. Defendant elected to stand on its motion for a directed verdict and accordingly offered no evidence.

In plaintiffs' main verdict-directing instruction defendant's negligence and consequent liability was predicated upon a finding that "as a direct result of the size of said fuses owned, installed and used by the defendant Union Electric Company, a corporation, on the primary side of its said transformer mentioned in the evidence that said fuses so owned, installed and used by the defendant Union Electric Company did fail to blow and open said circuit and stop the flow of electric current to the said short circuit, if any, at plaintiffs' home and if you further find that as a direct result of such failure, if any, that electrical current was permitted to pass through said wires from the defendant Union Electric Company's said transformer to the place of said short circuit, if any, for a longer period of time than was reasonably safe to the wires within the conduit attached to the garage at plaintiffs' home mentioned in the evidence, then you may find that the defendant Union Electric Company, a corporation, was guilty of negligence, if any, in the installation and use of said 2 – 10 ampere Matthews 100 – U fuse links on the primary side of said transformer."

" 'It is an elementary principle of the law of torts that there can be no actionable negligence in the absence of the existence of some duty on the defendant's part owing to the plaintiff, which duty has been neglected or violated by the defendant, with the injury suffered by the plaintiff directly attributable thereto, and flowing therefrom.' " Hiltner v. Kansas City, Mo.Sup., 293 S.W. 2d 422, 427. It would seem that the ultimate, decisive question presented upon this appeal is whether any duty existed which would have required defendant to fuse its transformer in such a manner as to make plaintiffs' wires and other electrical facilities reasonably safe (and thus protect plaintiffs from injury or damage therefrom) in the event of the occurrence of a short circuit in the wires which had been installed by plaintiffs and which were owned, controlled and maintained by them.

We have concluded that defendant did not owe any duty to plaintiffs to fuse its transformer so as to afford protection to plaintiffs' property from damage resulting from defects in the wires owned and controlled by plaintiffs and hence the trial court erred in overruling defendant's motion for a directed verdict. We think that the rule we hereafter approve is not only reasonable and logical but is supported by the great weight of authority.

"The duty and responsibility of a mere generating company is generally held to be limited to making a proper connection and delivering the electric current to the purchaser's wires and appliances in a manner which, so far as such delivery is concerned, protects life and property, and there is no duty of inspection to see that the purchaser's wires and appliances are in a safe condition and kept so. Accordingly, where wiring or other electrical appliances on private premises are owned and controlled by the owner or occupant of such premises, a company which merely furnishes electricity is not responsible for the insulation or condition of such wiring or appliances and is not liable for injuries caused

by their defective condition, to such owner or occupant * * *." 29 C.J.S. Electricity § 57(a), p. 611. A very brief statement of the general rule is as follows: "It is generally held that where the electric wires or other appliances which have caused injury are not owned or controlled by the company furnishing the power, such company is not liable for the damage sustained." 18 Am. Jur., Electricity, § 102, p. 498. And in the annotation appearing in 134 A.L.R. 507, 508, it is stated that "Subject to certain qualifications * * * such as knowledge of defects in wiring or appliances through which electricity is transmitted, and duty as to making proper connections with the wires or appliances of the consumer,—the rule is that where the company generating electric current does not own, control, or maintain the wires or appliances over which its current is transmitted to a consumer it is not liable for injuries to the person or property of the consumer who owns, controls, or maintains such wires or appliances." See also Dabbs v. Tennessee Valley Authority, 194 Tenn. 185, 250 S.W. 2d 67, and Smith's Adm'x v. Middlesboro Electric Co., 164 Ky. 46, 174 S.W. 773.

In considering the difficulties that would attend the adoption of a contrary rule the court, in Minneapolis General Electric Co. v. Cronon, 8 Cir., 166 F. 651, 655, 20 L.R. A.,N.S., 816, stated: "Can the company, unbidden, enter at will the private house of the citizen and pass into its various rooms to inspect these wires every day to see that they are in proper condition for the reception of the electricity it has contracted to sell? If so, it must employ a large retinue of competent men to do this work; and, as absolute insurers under the rule contended for, the necessities of the situation would demand that they should have free access to these buildings at all hours and under all conditions. Such a rule of law would tend to put concerns furnishing electricity to private houses out of business." So far as we can ascertain, the courts of Missouri have not thus far been called upon to decide the instant question.

However, in a statement of dictum, we have apparently approved the general rule as indicated by the following: "* * * the weight of authority seems to support the view that, if the appliances of the customer are not constructed or owned by the company generating the electricity, the company is not bound to inspect the same, and is not liable for an injury that is received by reason of defects in such appliances, where it has no knowledge of the defects, though the electricity which causes the injury comes from its generating plant." Kuhlman v. Water, Light & Transit Co., 307 Mo. 607, 271 S.W. 788, 796.

Of course, under the evidence in this case, defendant could have afforded protection to plaintiffs' wires (and property) by fusing its transformer with 5-ampere instead of 10-ampere fuses. However, the fact that it *could* have done so does not mean that it had a duty so to do. The use of 5-ampere fuses would have caused more frequent interruptions in the service to all customers served by the transformer. These "outages" could result from defects in the wiring of any such customer or from "surges" of excess current which sometimes exist in defendant's lines as a result of various operational procedures. We are unable to see any logical reason for adopting a rule which will subject all customers to inferior service when each customer can obtain the same character of protection by locating his fuse box or circuit breaker in such a manner (outside the building) that it will afford protection for all of his wires and facilities.

In reaching the conclusion that plaintiffs failed to make a submissible case, we have not overlooked the fact that Mr. Ross was permitted, over defendant's objection, to express the opinion that, because of the size of the fuses used by defendant in its transformer, the circuit serving the homes of the Stocks and plaintiffs was not reasonably safe. However, it is clear from his subsequent explanation and from his entire testimony that his reason for concluding that the circuit was not reasonably

safe was that there was a failure to afford protection against damage that resulted from defects in the wires owned and controlled by plaintiffs. In other words, we think the plain meaning of the expert's testimony was that the manner in which defendant delivered current to plaintiffs' wires was reasonably safe so long as there was no defect in plaintiffs' wires or facilities. As we have indicated, defendant had no duty to discover that defect or to protect plaintiffs from it.

Plaintiffs, of course, contend that they made a submissible case. At the outset they point to the general rule that suppliers of electricity must use the highest degree of care to keep their wires in such condition as to prevent injury to persons who may lawfully be in close proximity thereto. That is a well-settled rule but it obviously has no application here. The cases cited by plaintiffs may all be distinguished from the instant case. The following cases all deal with the care required of a defendant in connection with its own transmission or distribution lines and have no application to the question of the duty of a supplier to afford protection to the customer from the consequences of a short circuit in the wires of the customer. Those cases are: Brunell v. Mountain States Power Co., 9 Cir., 81 F.2d 305, Ledet v. Lockport Light & Power Co., 15 La.App. 426, 132 So. 272, Gibson County Electric Membership Corp. v. Hall, 32 Tenn.App. 394, 222 S.W.2d 689, O'Flaherty v. Nassau Electric R. Co., 34 App.Div. 74, 54 N.Y. S. 96, Abilene Gas & Electric Co. v. Thomas, Tex.Civ.App., 194 S.W. 1016, Lebow v. Missouri Public Service Co., Mo.Sup., 270 S.W.2d 713, Harrison v. Kansas City Electric Light Co., 195 Mo. 606, 93 S.W. 951, Kidd v. Kansas City Light & Power Co., Mo.App., 239 S.W. 584, and Thornton v. Union Electric Light & Power Co., 230 Mo. App. 637, 72 S.W.2d 161.

Plaintiffs have also cited the case of Pulsifer v. City of Albany, 226 Mo.App.

529, 47 S.W.2d 233, wherein the manufacturer (seller) of electric current was held liable for the death of plaintiffs' son who was killed when he touched the transmission line of the distributor (purchaser) of said current. However, in that case, there was evidence that the defendant had retained a measure of control over the purchaser's transmission line and also had knowledge of the unsafe condition of the line. The case is therefore distinguishable from the case at bar. We recognize, however, that there are statements in that opinion which might be construed as being in conflict with the views we have heretofore expressed and to the extent that the opinion may be so construed it should no longer be followed.

We also consider the cited case of Consolidated School Dist. v. West Missouri Power Co., 329 Mo. 690, 46 S.W.2d 174, as inapplicable to the instant factual situation. In that case liability was predicated upon evidence that defendant had permitted two transformers to become defective, thus permitting a greater voltage of electricity than was reasonably safe to be discharged into plaintiff's wires, which condition caused a fire that destroyed plaintiff's school building. That is an entirely different situation than the instant one wherein excess current was drawn from the transformer solely because of a short circuit in the wires of plaintiffs' house. The case does not support plaintiffs' contentions.

As indicated, the judgment herein must be reversed. It is so ordered.

COIL and HOUSER, CC., concur.

PER CURIAM.

The foregoing opinion by HOLMAN, C., is adopted as the opinion of the court.

All concur.